IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-26-15-RAW |
| ) | |
| CALVIN RAY WESTFIELD, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Defendant Calvin Ray Westfield stands charged by way of a one-count indictment with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(8). Defendant moves to suppress all evidence obtained pursuant to a detention and subsequent arrest. The Court referred Defendant's motion for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See* Docket No. 30. The undersigned Magistrate Judge held a suppression hearing on April 29, 2026. *See* Docket No. 37. For the reasons set forth below, the undersigned Magistrate Judge recommends that Defendant Calvin Westfield's Opposed Motion to Suppress [Docket No. 28] be DENIED.

### I.     Factual Summary

Shortly before 11:30 a.m. on August 28, 2025, Hugo Police Department ("HPD") dispatch received a call from the Manager at Jackson Storage in Hugo, Oklahoma, during which the caller reported a man with a gun who was also a convicted felon. The Manager reported that the person's name was Calvin Westfield, he rented Unit 28, and he appeared to have a rifle of some sort, but he had been "stirring up trouble" all morning. With this

information, dispatch notified an officer that "Unit 28 has a rifle," and officers left for the Storage facility. When asked if Defendant was threatening anyone, the Manager reported that Defendant appeared to walk toward the office with the gun in his hand, then turned around and went back toward his unit, and the Manager believed he was a threat. At that point, the Manager also noted that officers had just been there because Defendant was intimidating some women at the Storage facility. The officers came back over dispatch to inquire if the person was threatening anyone, and the dispatcher relayed that the individual was holding a gun, started toward the office, then turned and went back to Unit 28. The dispatcher can then be heard speaking to an officer over the radio and identifying Defendant by name.

At the suppression hearing, HPD Captain Dustin Spalding testified that he was the first officer to arrive, at 11:30 a.m., immediately followed by Lt. Billy Jenkins and Lt. Chad Allen together in a second vehicle, *see* Gov't Hr'g Ex. 8, and that upon arrival he observed Unit 28 was open but did not actually see Defendant. Cpt. Spalding testified that he drew his firearm as he exited his marked unit, but stopped and went to take cover behind his vehicle after Lt. Allen pointed out Defendant went back into Unit 28. Cpt. Spalding testified that Lt. Allen began ordering Defendant out of Unit 28, and Defendant complied with orders and was placed in handcuffs and detained. After Defendant was placed in handcuffs, Cpt. Spalding testified that he and Officer Tyler Shelby spoke with the Storage facility Manager and learned Defendant was a convicted felon, at which time he radioed dispatch to confirm Defendant's status. Defendant was then placed under arrest, and the two firearms were seized from Unit 28. Captain Spalding further testified that he never

saw Defendant holding a firearm, and had no previous knowledge of Defendant or his status as a felon.

Lt. Billy Jenkins testified after Cpt. Spalding, stating that he knew Defendant prior to the August 28, 2025, incident based on prior callouts to Defendant's residence, and for a sufficient length of time that he was on a first-name basis with Defendant. He explained that he also knew Defendant from working after hours as a security guard at a housing authority in Hugo where Defendant had lived at one time, and that he had had a conversation with Defendant at a barbecue restaurant in Paris, Texas,[1] approximately three years earlier. Lt. Jenkins testified that, based on these previous interactions, he was aware of Defendant's status as a convicted felon because Defendant himself informed Lt. Jenkins that he had killed someone.[2]

Lt. Jenkins testified that he responded to the callout based on the nature of the call, and at first only understood that the call was about a person with a firearm. As they responded, however, more information was provided over the radio, including Defendant's name, which Lt. Jenkins recognized. He testified that when he and his partner Lt. Chad Allen heard Defendant's name over the radio while still in the vehicle, he told Lt. Allen that Defendant is a felon. Lt. Jenkins testified that, based on previous interactions with Defendant, he knew to respond cautiously.

---

[1] The undersigned Magistrate Judge notes that Defendant has previously been located in Paris, Texas. *See, e.g.*, Docket No. 24, p. 1.

[2] Tulsa County, Oklahoma District Court Case No. CF-1999-1147 reflects a conviction against Calvin Ray Westfield for First Degree manslaughter in November 1999. The Court may take judicial notice of both its own docket sheets and other state or federal court docket sheets. *United States v. Ahidley*, 486 F.3d 1184,1192, n.5 (10th Cir. 2007) ("We may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

Upon arrival at the Storage facility, Lt. Jenkins testified that he and Lt. Allen arrived almost immediately after Cpt. Spalding, and from the vehicle he observed Defendant standing in the open door of Unit 28 with something that looked like a long gun in his hand. As the officers were exiting their vehicles, Lt. Jenkins testified that Defendant briefly ducked out of sight and then appeared again with nothing in his hands. His testimony agreed with Cpt. Spalding to the extent that both described Defendant as quick to comply with officer instructions, and that Defendant was handcuffed immediately. While Asst. Chief Babcock handcuffed Defendant, Lt. Jenkins testified that he approached Unit 28 and, before entering, observed the long gun while looking in, then also a handgun upon entering Unit 28. Lt. Jenkins testified that he was quickly able to see that no one else was in Unit 28, or he would have performed a further protective search. Upon cross-examination, Lt. Jenkins agreed that he only told Lt. Allen about Defendant's convicted felon status, stating he thought all the other officers were already aware of the status.

No body-camera footage was provided for this incident. Cpt. Spalding testified that he had been issued a body-worn camera, but that he had turned it over to a patrol officer whose camera had broken. Lt. Jenkins testified that he was not wearing a body camera at the time of the incident. Officers Tyler Shelby[3] and Thomas Ray, as well as Captain Dustin Spalding,[4] completed Incident Reports describing the events of the day. Dfdt. Hr'g Ex. 3, pp. 4-6. Officer Shelby's report indicated that he arrived on the scene after Defendant had been detained, noting that he walked up to see the storage unit open and the two firearms

---

[3] Cpt. Spalding described Officer Shelby as the primary officer on the scene, but Officer Shelby did not testify at the suppression hearing.
[4] Cpt. Spalding was an officer at the time of this incident, but has since been promoted to Captain. The undersigned Magistrate Judge uses his present title for clarity.

in plain sight. *Id.*, p. 4. Officer Ray also reported that he arrived after Defendant had been detained, and that two firearms had been located at the scene. *Id.*, p. 6.[5] Then-Officer (now Captain) Spalding's report indicates that he heard the call go out over dispatch, including the information that the reported individual had a gun and walked toward the office then back to Unit 28, as well as Defendant's name. Spalding then indicates that he arrived at the Storage facility and saw Defendant standing inside Unit 28, that Lt. Chad Allen began ordering Defendant out of Unit 28, and Defendant complied. Defendant exited Unit 28, and the officers were joined by Assistant Chief Steve Babcock, who handcuffed Defendant. A radio dispatch recording at approximately 11:38 a.m. records an officer describing the incident as having "one detained." Govt. Hr'g Ex. 17. Spalding reported that after Defendant was detained, he, Lt. Jenkins, and Lt. Allen all approached Unit 28 to clear it for officer safety purposes, at which time Jenkins noted the presence of the two firearms. Spalding then spoke with the Manager at the Storage facility, who informed him Defendant is a convicted felon. Spalding radioed dispatch around 11:40 a.m. to confirm Defendant's status. Dfdt Hr'g Ex. 3, p. 5 & Gov't Hr'g Ex. 18. Neither Lt. Jenkins, Lt. Allen, nor Asst. Chief Babcock completed incident reports, despite HPD policy that "[w]hen a member responds to a call for service . . . the member shall document the incident regardless of whether a victim desire prosecution," and this includes all arrests and all felony crimes. Dfdt Hr'g Ex. 1, p. 2 (Report Preparation, § 322.5.1). Lt. Jenkins testified that he forgot to prepare a report.

## II.      Analysis

---

[5] Officer Ray had responded to the Storage facility earlier in the day regarding complaints about Defendant's behavior.

Defendant's original motion to suppress raised the argument that the officers only learned of Defendant's status as a convicted felon after they arrested him without probable cause or after detaining him in the absence of reasonable suspicion.  The Government concedes that, while the Manager reported Defendant's convicted felon status to the dispatcher, there is no radio traffic reflecting that the dispatcher informed the officers of Defendant's status; however, Lt. Jenkins knew of Defendant's self-reported convicted felon status.  Defendant nevertheless argues for suppression, asserting that Lt. Jenkins did not share his knowledge regarding Defendant's convicted felon status, which is supported by the lack of Incident reports from Lt. Jenkins or Lt. Allen.[6]

Furthermore, Defendant contends that there was conflicting testimony as to where the firearms were located, whether Defendant was standing inside or outside the unit upon the officers' arrival, and whether Defendant was actually holding a gun in view of the officers at any point.  Although not made in explicit terms, Defendant also appears to raise concerns related to Lt. Jenkins's credibility.  According to the Government, the callout from dispatch originally identified a person walking around the Storage facility with a gun, which was followed up with Defendant's name for identification.  While listening to the radio, Lt. Jenkins was therefore aware of the presence of a gun and Defendant's suspected presence at the scene.  Additionally, Lt. Jenkins's uncontested[7] testimony is that he had conveyed his knowledge of Defendant's status as a convicted felon to Lt. Allen while they were in the vehicle together.  Upon arrival at the Storage facility, Lt. Jenkins testified that,

---

[6] Defendant does not raise Asst. Chief Babcock's failure to submit a report as an issue related to suppression.

[7] Lt. Allen did not testify at the suppression hearing and did not submit a written report of the incident.

before he even exited his vehicle, he observed Defendant with a gun.

A. *Categorizing and Assessing the Officers' Encounter with Defendant*

"The Supreme Court has identified three types of police/citizen encounters: **consensual encounters, investigative stops, and arrests**. Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (emphasis added) (citation omitted). No party asserts this was a **consensual encounter**.

> An **investigative detention**, which is also referred to as a Terry[8] stop, is a seizure within the meaning of the Fourth Amendment, but unlike an arrest, it need not be supported by probable cause. The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. Based on the totality of the circumstances, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information.

*Oliver*, 209 F.3d at 1186 (emphasis added) (internal quotations and citations omitted).

> On the opposite extreme are **arrests**, which are characterized by highly intrusive or lengthy search or detention. An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee. Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.

*Oliver*, 209 F.3d at 1186 (emphasis added) (internal quotations and citations omitted).

"These categories are not static and may escalate from one to another." *United States v.*

---

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

7

*White*, 584 F.3d 935, 945 (10th Cir. 2009) (quotation omitted).

### 1.   Officers Lacked Probable Cause for an Arrest

The Government contends Officer Jenkins had probable cause when he recognized Defendant's name from dispatch, knew Defendant was a convicted felon, and saw Defendant holding a firearm, and that all this occurred before any command or type of detention was initiated.  Lt. Jenkins's testimony is that, prior to August 28, 2025, he had encountered Defendant, had heard through conversations that Defendant had previously been incarcerated, and Defendant himself told Lt. Jenkins that he had killed someone.  At the suppression hearing, a hypothetical posed to Lt. Jenkins asked what, if any, action Lt. Jenkins would have taken if the other officers at the scene said they were going to release Defendant.  Lt. Jenkins responded that he would have double-checked the information to verify his belief that Defendant was a felon.  Lt. Jenkins clearly testified that, at the time of the incident, he *believed* Defendant was a convicted felon; however, the testimony does not indicate that this belief had ever previously been verified.  It is not clear that Lt. Jenkins's belief that Defendant was a convicted felon meets the knowledge requirement of probable cause.  Moreover, Lt. Jenkins testified that he *thought* the object in Defendant's hand was a long gun, but his lack of certainty is likewise insufficient for probable cause. As discussed more fully below, however, the officers clearly had sufficient evidence for reasonable suspicion supporting an investigative detention.  *Cf. United States v. Jones*, 2007 WL 757895, at *4 (W.D. Mo. Mar. 8, 2007) (finding reasonable suspicion where "Jones was suspected of being a felon in possession of ammunition. This suspicion was based on [Officer's] belief that he recognized Jones as a felon and his knowledge that Jones

possessed ammunition and [other Officer's] observation that Jones hesitated the first time the pawnshop cashier asked whether he was a felon.").

> ### 2. Investigatory Detention was Reasonable as to Suspicion, Scope, and Duration

An investigatory detention is the middle ground between consensual encounters and arrests inasmuch as it "is more intrusive than a consensual encounter (not subject to the Fourth Amendment) and less intrusive than an arrest (requiring either a warrant or probable cause). Assessing the reasonableness of an investigatory stop requires a twofold inquiry." *United States v. Campbell*, 156 F.4th 1019, 1024 (10th Cir. 2025) (internal quotations and citations omitted). This two-fold inquiry requires asking: (1) whether, under the totality of the circumstances, an officer has a *reasonable suspicion* that criminal activity is afoot, and (2) whether the investigatory stop is "*reasonably related* in scope" to the circumstances. *Id.*

"*Reasonable suspicion* requires 'more than an inchoate and unparticularized suspicion or hunch' but 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *United States v. Young*, 99 F.4th 1136, 1143 (10th Cir. 2023), *as corrected* (May 24, 2023) (quoting *United States* v. *Sokolow*, 490 U.S. 1, 7 (1989)). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention." *United States* v. *Pettit*, 785 F.3d 1374, 1379-80 (10th Cir. 2015) (internal quotation marks and citation omitted). As long as this standard is met, an officer "may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Id.*, 785 F.3d at 1380. "[W]hat matters are 'objective facts, not the officer's state of mind.'"

9

*Young*, 99 F.4th at 1143 (quoting *United States* v. *Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002)). Lt. Jenkins and Lt. Allen possessed a particularized and objective basis for suspecting Defendant was a felon and in possession of a firearm, first based on the Manager's tip, which was then corroborated by Lt. Jenkins's observations before officers made contact with Defendant.

> A tip to the police, like a 911 call, can justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur. Our analysis to determine a tip's reliability is 'case-specific and factor-based. We consider:
> > (1) [W]hether the informant lacked "true anonymity" (*i.e.*, whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.
> [N]o single factor is dispositive.

*United States v. Daniels*, 101 F.4th 770, 777 (10th Cir. 2024) (internal quotations omitted). "[E]ven a reliable tip must create 'reasonable suspicion that 'criminal activity may be afoot.'" *Id.*, 101 F.4th at 778 (quoting *Navarette v. California*, 572 U.S. 393, 401 (2014) (citing *Terry*, 392 U.S. at 30)). The Manager tipster in this case identified herself by name and location, as well as employment title, and was calling to report information that was happening contemporaneously to her call, as well as the context that the same individual had already been involved in a previous call earlier in the day. *See United States v. Copening,* 506 F.3d 1241, 1247 (10th Cir. 2007) ("The fact the caller provided authorities some basis for discovering his identity makes it less likely his tip was phony."). She observed Defendant walking around the Storage facility with a gun, she knew he was a

10

convicted felon, she identified Defendant by name, and she stated that she felt threatened but agreed Defendant had not pointed the gun at her. The Manager's belief that Defendant was a convicted felon was not relayed over the dispatch call, but Lt. Jenkins himself believed Defendant was a convicted felon. Additionally, upon arrival Lt. Jenkins observed Defendant holding what appeared to be a firearm prior to any contact or communication, and he had communicated belief in Defendant's convicted felon status to Lt. Allen. At the scene with Lt. Jenkins, Lt. Allen issued instructions and actively participated in Defendant's detention while Lt. Jenkins proceeded to secure Unit 28. *See United States v. Latorre*, 893 F.3d 744, 754 (10th Cir. 2018) ("[T]he vertical collective knowledge doctrine only requires 'some communication between the officer or officers with probable cause and the officer who executes the stop or search,' because the communication 'confirms that the officers are functioning as a team.'") (quoting *United States v. Chavez*, 534 F.3d 1338, 1347 n.13 (10th Cir. 2008)).

In order to be *reasonably related* in scope, an "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of either dispelling or confirming the officer's reasonable suspicion[.]  Once reasonable suspicion has been dispelled, even a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment." *Campbell*, 156 F.4th at 1024 (quoting, *inter alia*, *United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013). "The Supreme Court has 'emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) (quoting *United States v. Sharpe*, 470

11

U.S. 675, 685 (1985)). "Forceful methods may be used during an investigative detention short of arrest only when such methods are necessary for officer protection." *Id.* (citing *Neff,* 300 F.3d at 1220). As such, "'[t]he use of firearms, handcuffs, and other forceful techniques' generally exceed the scope of an investigative detention and enter the realm of an arrest." *Cortez v. McCauley,* 478 F.3d 1108, 1115-1116 (10th Cir. 2007) (quoting *United States v. Melendez-Garcia,* 28 F.3d 1046, 1052 (10th Cir. 1994) (quotation marks omitted). Accordingly, in the event handcuffs are used during an investigatory detention, the Government must "demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Melendez-Garcia*, 28 F.3d at 1052 (quotation omitted).

Lt. Jenkins testified that, given his belief in Defendant's status as a convicted felon, the nature of previous conversations with Defendant including Defendant's self-report of having killed someone, as well as "the time we're living in," he had concerns regarding officer safety. The Court therefore finds Lt. Jenkins had reason to believe Defendant had at least one gun and a history of violence, warranting "the unusual intrusiveness" of handcuffing him. *Cf. Melendez-Garcia*, 28 F.3d at 1052-1053 ("[T]here was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop. In the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop."). As in *Neff*, the undersigned Magistrate Judge believes "that the facts of record provide reasonable, articulable grounds

for the officers to handcuff Defendant.  The officers had reason to fear someone who was reliably reported to be carrying an unlawful weapon."  *Neff*, 300 F.3d at 1221; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010) ("Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo."); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (use of firearms and handcuffs reasonable where police encountered a suspect believed to be armed and dangerous); *United States v. Valenzuela*, 231 Fed. Appx. 785, 788 (10th Cir. 2007) ("'[T]he use of guns in connection with a stop is permissible where the police reasonably believes the weapons are necessary for their protection.'  In holding the use of firearms reasonable under certain circumstances, we noted that '[w]henever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt.'") (quoting *Perdue,* 8 F.3d at 1462, and *United States v. Merritt,* 695 F.2d 1263, 1274 (10th Cir. 1982)).

The undersigned Magistrate Judge therefore finds that the use of handcuffs while officers went to Unit 28 to determine if other people were present and to search for weapons did not violate the Fourth Amendment.  *United States v. Flowers*, 203 Fed. Appx. 221, 224 (10th Cir. 2006) ("[T]he officers' continued use of handcuffs after they patted down Mr. Flowers did not violate the Fourth Amendment.  Even though the officers found no weapons in Mr. Flowers's pockets, Ms. Harring's report that Mr. Flowers had been armed indicated that he might still pose a threat to their safety.  Accordingly, the officers were authorized to keep Mr. Flowers in handcuffs while they continued to search for weapons.")

13

(citing *Neff*, 300 F.3d at 1220-1221 (concluding that officers did not act unreasonably by continuing to hold suspects in handcuffs while they searched a car for weapons)). Indeed, two firearms were located by officers in plain view either while Defendant was being handcuffed or in the immediate aftermath of Defendant being handcuffed.

Within 10 minutes of the officers' arrival to the Storage facility and after the firearms had been identified, Cpt. Spalding called back to dispatch to confirm Defendant is a convicted felon. *See* Gov't Hr'g Ex. 18. Defendant's detention transformed to an arrest shortly after officers received that confirmation. Within 24 minutes of officers arriving on scene, Defendant had been detained, arrested, and transported to jail. Gov't Hr'g Exs. 9 & 19.

Whether the length of an investigative detention is reasonably related in scope to the circumstances is "an objective test; the reasonableness of the stop does not 'depend [ ] on the actual motivations of the individual officers involved.'" *United States v. Burleson*, 657 F.3d 1040, 1047 (10th Cir. 2011) (quoting *Whren v. United States,* 517 U.S. 806, 813 (1996)). "There is no absolute rule for determining how long an investigative detention may continue before it becomes unreasonable under the Fourth Amendment." *United States v. Rosborough,* 366 F.3d 1145, 1150 (10th Cir. 2004). "Rather, the length of the stop and the potential intrusion on an individual's Fourth Amendment rights must be juxtaposed against the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* (quotation omitted). The undersigned Magistrate Judge finds that the officers did not unnecessarily prolong the detention, but were immediately working to make sure the scene was secure

14

and to gather information regarding Defendant's status and statements from citizens at the scene. There was no interruption and no undue delay in the investigative process, and the undersigned Magistrate Judge finds the investigative detention was therefore reasonable in scope and duration. *See, e.g.*, *Young*, 99 F.4th at 1150.

Pursuant to the two-fold inquiry, the undersigned Magistrate Judge thus finds, under the totality of the circumstances, that officers had a *reasonable suspicion* that criminal activity was afoot, and the investigatory stop was *reasonably related* in scope to the circumstances to allow officers to detain Defendant until he was ultimately arrested following confirmation of Defendant's status as a convicted felon and the observation of the firearms in plain sight.

### 3. The Firearms were in Plain View and Lawfully Seized

Lt. Jenkins testified that, before he stepped into Unit 28, he observed the long gun, *i.e.*, rifle, as well as a handgun. "A plain view seizure of incriminating evidence is sustainable if (1) the item is indeed in plain view; (2) the police officer is lawfully located in a place from which the item can plainly be seen; (3) the officer has a lawful right of access to the item itself; and (4) it is immediately apparent that the seized item is incriminating on its face." *United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992). Lt. Jenkins was lawfully located outside Unit 28 when he first viewed the firearms and had a "lawful right of access" to them. Officer Shelby's written report supports this account, noting that Unit 28 was open and "a shotgun and a .22 caliber pistol [were observed] in plain view." Dfdt. Hr'g Ex. 3, p. 4. The incriminating nature of the firearms was likewise apparent, given Lt. Jenkins's belief that Defendant was a convicted felon. Furthermore,

15

the identification of the weapons supports a charge for disturbing the peace as the Manager reported that she felt threatened by the way Defendant carried a firearm around the Storage facility.   The undersigned Magistrate Judge therefore finds the firearms were lawfully seized.

### B.  Officer Credibility and Lack of Body Camera Footage

Finally, Defendant contends that Lt. Jenkins's testimony is problematic because he did not discuss his knowledge of Defendant's status as a convicted felon until after the motion to suppress was filed, and neither he nor Lt. Allen filed Incident Reports.  Defendant also contends that the testimony between Cpt. Spalding and Lt. Jenkins was conflicting, in that: (i) both officers arrived nearly simultaneously but Cpt. Spalding testified he did not see Defendant with a gun before he was detained and Lt. Jenkins testified that he did, (ii) the testimony was unclear as to where the officers were located when the firearms were seen, and (iii) Lt. Jenkins testified that he saw Defendant with a gun, but Defendant did not have a gun when he was handcuffed.  When "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Toro–Pelaez,* 107 F.3d 819, 824 (10th Cir.1997).  Based on Lt. Jenkins's testimony especially, each officer had a different view of the scene as they arrived in different vehicles and parked at reportedly varying angles.  Moreover, Lt. Jenkins testified that he kept his eyes on Defendant while Cpt. Spalding testified that at one point he retreated behind his car door.  The undersigned Magistrate Judge finds that it is possible that Cpt. Spalding and Lt. Jenkins did not see the same things when they arrived at the Storage facility and nevertheless finds credible Lt. Jenkins's testimony that he saw the gun in Defendant's hand

16

despite Cpt. Spalding's testimony that he did not.  Additionally, Lt. Jenkins testified that Defendant ducked out of sight before officers called him out of Unit 28, providing an opportunity to deposit any gun in his hand.  Given officers' testimony and reports that both firearms were located in plain sight toward the front of Unit 28, the undersigned Magistrate Judge finds plausible the testimony the Defendant had a gun in his hand at one point and later did not.

As to body-worn camera evidence, Lt. Jenkins testified that he was not wearing a body camera, and Cpt. Spalding testified that while he had been issued a body camera, he was not wearing it because he had given his to a patrol officer whose camera had broken. Defendant, understandably, is concerned regarding the lack of body camera footage, but the undersigned Magistrate Judge is unable to find a constitutional violation in the absence of footage, even if such lack was against HPD policy.  *United States v. Savage*, 2021 WL 7186266, at *5 (E.D. Okla. Nov. 19, 2021), *report and recommendation adopted*, 2022 WL 118408 (E.D. Okla. Jan. 12, 2022) ("[W]hile courts have generally agreed that a failure to follow department body camera policies 'deprived the Court from reviewing the best evidence available,' violations of police department body camera policy have generally been found insufficient to establish bad faith.") (quoting *United States v. Gibson*, 366 F. Supp. 3d 14, 26-27 (D.D.C. 2018)).

### III.    Conclusion

In summary, the undersigned Magistrate Judge PROPOSES the findings set forth above and RECOMMENDS that Defendant Calvin Westfield's Opposed Motion to Suppress [Docket No. 28] be DENIED.  Any objections to this Report and

17

Recommendation must be filed within fourteen (14) days.  Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

IT IS SO ORDERED this 5th day of May, 2026.

_____

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**